**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

v.

**W. J. WRIGHT, Appellee.**

**No. 7435.**

Court of Civil Appeals of Texas, Beaumont.

March 8, 1973.

Motion for Rehearing Overruled April 19, 1973.

Fuller, Fuller & McPherson, Port Arthur, for appellant.

Waldman & Smallwood, Daylee Wiggins, Beaumont, for appellee.

STEPHENSON, Justice.

This is an action brought under the Workmen's Compensation Law. Trial was by jury and judgment was rendered on the verdict that plaintiff recover for total and permanent loss of use of his left leg. The parties will be referred to here as they were in the trial court.

The uncontroverted evidence shows that plaintiff received an injury to his left leg March 10, 1969, and was furnished an operation on July 17, 1969. He continued to have trouble with his leg and on August 25, 1970, he made a request of the Industrial Accident Board that it order defendant to furnish a second operation. After a hearing, the Board entered such an order on January 26, 1971. However, plaintiff then declined to undergo surgery and later filed this suit.

The jury failed to find that the operation ordered would have materially and beneficially improved plaintiff's condition. Defendant has a point of error that the trial court erred in failing to disregard the answer to that issue and in failing to render judgment non obstante veredicto limiting plaintiff's recovery to fifty-two weeks of benefit because the undisputed evidence shows that such operation would have materially and beneficially improved plaintiff's condition. This is a no evidence point and, in passing upon it, we consider only the evidence favorable to the jury's answer.

*Art. 8306, § 12b, Vernon's Ann.Civ.St.,* the hernia statute, provides, in effect, that the Board can order an operation and, if the employee refuses to submit, he is entitled to compensation for incapacity under the general provision of the law for a period not exceeding one year. In *Art. 8306, § 12e, V.A.C.S.,* it is provided:

> "In all cases where liability for compensation exists for an injury sustained by an employee in the course of his employment and a surgical operation for such injury will effect a cure of the employee or will materially and beneficially improve his condition, the association or the employee may demand that a surgical operation be had . . . ."

It provides that the Board may order an examination, as in a hernia case, and, if the evidence shows that "such operation is advisable and will relieve the condition of the injured employee or will materially benefit him," the Board can order an operation. If the employee refuses to submit to the operation, the Board may order the suspension of all or a part of his compensation.

> "The results of such operation, the question as to whether the injured employee shall be required to submit thereto and the benefits and liabilities arising therefrom shall attach, be treated, handled and determined by the board in the same way as is provided in the case of hernia in this law." *Art. 8306, § 12e, V.A.C.S.*

A part of the evidence in this case is a letter written by plaintiff's attorney to the Board showing that a copy of a medical opinion of Dr. Bruce M. Cameron recommending surgery was enclosed and requesting defendant to furnish that treatment. Dr. Cameron was shown to be a specialist in orthopedic surgery and plaintiff had been sent to him by his attorneys. The evidence shows that, pursuant to that request, the Board appointed Dr. Hugh E. Alexander, Jr., to examine plaintiff. Dr. Alexander's report to the Board is part of this record and in it he recommends an operation. Based upon plaintiff's request and Dr. Alexander's report, the Board entered a unanimous order in writing finding that a surgical operation should be performed on plaintiff and "that such operation is not ordinarily unsafe and will materially benefit and improve claimant's condition." The order named Dr. Alexander to perform the operation within the next twenty days. Plaintiff admits that he refused to submit to the operation.

■ Apparently the Supreme Court of Texas has not directly passed upon the question before us, even though these statutes were before the court in Garcia v. Travelers Insurance Company, 365 S.W.2d 916 (Tex.1963) and in Truck Insurance Exchange v. Seelbach, 161 Tex. 250, 339 S. W.2d 521 (1960). In both of these cases, liability was not limited because no order was made while the claim was pending before the Board. In each instance, it was held that the trial court did not have that authority. In our present case, as mentioned, there is an order of the Board ordering the surgery and tracking the wording of the statutes in finding that the operation was not ordinarily unsafe and that it would materially benefit and improve plaintiff's condition. As stated in *Garcia,* supra, upon receipt by plaintiff of the order of the Board directing surgery, plaintiff was put to the election to either have the surgery or be limited to compensation for a period not to exceed fifty-two weeks.

A careful reading of the statutes indicates that there are two questions to decide before ordering an operation. First, would the operation be more than ordinarily unsafe and, secondly, would the operation effect a cure or materially and beneficially improve the employee's condition. The first question was not submitted, the only issue asking if the operation ordered would have materially and beneficially improved plaintiff's condition.

Plaintiff testified that he had seen three bone specialists and they all recommended surgery. He said they told him they did not know what was wrong and that they did

not know what they would be going after. He testified about the first operation being unsuccessful and as follows: "Well, I don't want them to operate if they don't know what they're doing before they get in there. I'm too old to become a guinea pig now." Dr. Cameron testified that plaintiff needed an operation and detailed the specific things that needed to be done. He stated that he had not told plaintiff that he needed to have his knee explored. He could not guarantee the outcome of the operation. In his opinion, the surgical procedure would have been successful and would have worked and plaintiff would be able to go about doing his job as a welder. Dr. Richard L. Shorkey testified that he performed the first operation and described it at length. He recommended the second surgery and stated that in his opinion it would be beneficial.

■ Defendant's no evidence point is sustained. The evidence in this record establishes as a matter of law that the second operation would have materially and beneficially improved plaintiff's condition.

We find no merit to defendant's remaining points of error and they are overruled. We proceed to render the judgment that the trial court should have rendered. It is ordered that plaintiff recover fifty-two weeks of benefit at the rate of $35.00 per week, less thirty-two weeks of benefit already paid to plaintiff, leaving a balance of twenty weeks, plus interest from the date of the judgment.

Reversed and rendered.

*On Motion for Rehearing*

DIES, Chief Justice.

I respectfully dissent. I would remand this case for a new trial, holding the evidence insufficient to support the jury's finding to Special Issue No. 17. I believe there is some evidence to support this finding as follows:

Plaintiff first injured this leg in March, 1969, and was later operated on by Dr. Shorkey. After the surgery, "I couldn't work regular there on account of my knee swelling so bad on me. It was just so painful until I just couldn't hold up to the work regular. * * * It never has got along well, never has." At times his knee locks on him and climbing, stooping or lifting causes bad swelling.

He has been to three doctors who all recommended surgery. The following evidence was given without objection:

"Q Well, do they specifically tell you what is wrong?

"A No, sir, they don't; they don't know.

"Q What did they say?

"A They all want to go in there and operate but they don't know what they're going in after.

"Q In other words, merely to go into explore?

"A Yes, sir. The fluid drains out of the front of my leg into the back of my leg—

"Q Yes, sir.

"A —and that—it's very painful.

"Q How can you tell that?

"A Well, all three of the doctors told me the same thing, that it would drain, the fluid was leaking in back.

*    *    *    *    *    *

"Q How about Doctor Shorkey, the one who initially did the surgery, did he tell you what—

"A Dr. Shorkey don't know. He said said, Well, he'd have to go back in there and see what he could find and at my age that's not good.

*    *    *    *    *    *

"Q All right. Now, you know they are saying here that you have refused to have the surgery done on your knee. Is that correct?

"A Well, I don't want them to operate if they don't know what they're doing before they get in there. I'm too old to become a guinea pig now.

"Q Now, that's what I'm getting at. The first operation that was done by Doctor Shorkey, did that—that apparently was not a successful operation.

"A Evidentally it wasn't.

"Q All right. Since that time, since this thing happened back in '69, have you almost without exception daily you have pain and discomfort in that knee?

"A Yes, sir. Yes, sir."

Dr. Cameron, an orthopedic specialist, found arthritis in plaintiff's knee due to his injury and testified that his condition would get worse in the future. The doctor gave the following testimony:

"A Well, this is what I thought: This man can have his knee reconstructed if he wants to. The man's already had one operation and it's pretty hard to sell him on another one because you've been through the fire once, you just don't want to do it again, but this man needs to have the forces on his knee corrected, which means he has to have a long operation here which we open the knee and loosen it over here and tighten it over here and then the knee will—the patella will slide properly where it is. Prior to this surgery, he ought to have a special X-ray test called an arthrogram in which we put the material in this knee and this radio-opaque substance flows in and about the knee and you can see pretty well what's wrong. Now, he's got that torn ligament in there and we know we can't repair it because it doesn't work very well so we'd have to transplant a muscle down in here to take the place of this ligament. That's called a pes plastic, and then at the same time that operation, he ought to have that inside compartment in here explored to see if he's got a piece of retained cart-

lidge back there. We'd be able to see that in the arthrogram, so he needs a rather massive reconstruction of his knee and then all these spurs ought to be cleaned up.

"Q Then can you or the medical profession give me, say, an Oklahoma guarantee about this situation?

"A I don't exactly know what an Oklahoma guarantee is—

"Q Well, I—

"A —but no, you can't.

 *   *   *   *   *   *

"Q And, Doctor, of course, again, there is no—in medical science there is no—there's really no way to guarantee the outcome of one of these operations?

"A No.

 *   *   *   *   *   *

"Q With the corrective surgery, what then would have been your opinion as to his disability?

"A About fifteen to twenty per cent."

Dr. Cameron had previously assessed his disability before surgery at thirty or forty percent.

Dr. Shorkey advised plaintiff to have further surgery. Portions of his testimony are as follows:

"Q To that extent, I suppose you doctors would say that the surgery was somewhat exploratory?

"A Well, in that sense, yes.

 *   *   *   *   *   *

"Q Doctor, are you able to tell us right now what is wrong with this man's knee?

"A Not without looking into it, no.

 *   *   *   *   *   *

"Q And there, of course, is no way for you or any other doctor to tell us that the next operation would be successful, is there?

"A No.

"Q All right, and even after that, it may, if it was not, there may be another operation that's required down the line, isn't that correct?

"A Well, you'd hope not, but it's possible."

I contend that these facts or circumstances represent some evidence to support Special Issue No. 17: (1) The first operation was, without doubt, unsuccessful. (2) The surgery recommended by Dr. Cameron was very involved. We can take notice that the more involved a surgical procedure is, the less likely is its success. (3) The testimony of Dr. Shorkey that he really would not be sure of plaintiff's difficulty or the corrective measures until he got into the knee. (4) Dr. Shorkey's testimony of the uncertainty of success. Of course, this can be said of any surgery, but it seems greater here than in simpler procedures such as hernia. (5) The medical possibility that the present arthritic condition of plaintiff's knee will increase after surgery.

"It was not the intent of the law that the insurer could continue to experiment upon the body of appellee against his wishes on the expert testimony of physicians, no matter how eminent, that *another* operation would be successful." Indemnity Ins. Co. of North America v. Jones, 299 S.W. 674, 675 (Tex.Civ.App., Beaumont, 1927, dism.), emphasis by the court.

"In construing the foregoing two sections [Art. 8306, §§ 12e and 12b, V.A.C.S.], it must be determined whether or not the operation was a major operation, and whether or not the appellee is required to take such an operation, regardless." Texas Employers' Ins. Association v. Ellis, 365 S.W.2d 676, 682 (Tex.Civ.App., Texarkana, 1963, error ref. n. r. e.).